# IN THE SUPREME COURT OF IOWA

No. 20–1148

Submitted January 19, 2022—Filed June 10, 2022

**ANDREW LENNETTE,** Individually and on behalf of C.L., O.L., and S.L., Minor Children,

Appellant,

vs.

**STATE OF IOWA, MELODY SIVER, AMY HOWELL,** and **VALERIE LOVAGLIA,**

Appellees.

---

Appeal from the Iowa District Court for Linn County, Mary E. Chicchelly, Judge.

A father, who was temporarily ordered to vacate the family home based on allegations of sexual abuse that were eventually deemed unfounded, appeals the district court's grant of summary judgment dismissing his constitutional and common law tort claims against the State of Iowa and employees of the department of human services. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Appel, Waterman, McDonald, and McDermott, JJ., joined. Appel, J., filed a concurrence. McDonald, J., filed a concurrence. Oxley, J., took no part in the consideration or decision of the case.

Martin A. Diaz (argued) of Martin Diaz Law Firm, Swisher, and Natalie H. Cronk of Kennedy, Gelner, Cronk & Waterman, P.C., Iowa City, for appellant.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson (argued), Solicitor General, and Noah Goerlitz and Job Mukkada, Assistant Attorneys General, for appellees.

**MANSFIELD, Justice.**

**I. Introduction.**

Force should be right; or rather, right and wrong,

Between whose endless jar justice resides . . . .

William Shakespeare, *Troilus and Cressida* act I, sc. 3.

Our legal system is sometimes messy. Mistakes get made. But in the end, our legal system usually stumbles to the right result.

A father going through a contentious divorce was accused by his young daughter of sexual abuse. An experienced Iowa Department of Human Services (DHS) social worker observed the forensic interview firsthand. She believed it was credible, obtained additional information primarily from the mother, and sought and obtained an ex parte court order requiring the father to leave the family home. Months later, the ensuing adversary proceeding determined that the allegation was unfounded and that the mother had "wanted [the father] out of the house." The DHS finding of abuse was set aside and, eventually, the father obtained physical care of the children.

The father then sued the State of Iowa, the DHS worker, and her two supervisors, alleging that they committed common law torts and constitutional violations by initially accepting the child's account of sexual abuse and not discerning the mother's scheme. These kinds of claims historically require a high threshold of proof because we do not want to discourage social workers from acting affirmatively and boldly to protect children. After discovery, the district

court granted summary judgment to the defendants, reasoning both that immunities applied and that, in any event, the claims failed on the merits.

On appeal, we agree that summary judgment was properly granted on the merits. Specifically, the father's claim of intentional interference with the parent–child relationship fails because that claim applies to extralegal actions—such as a parent absconding with a child—not to judicially-approved acts. The father's claim for intentional infliction of emotional distress fails because the conduct here did not reach the level of an "outrage" necessary to sustain such a claim. The father's unreasonable search and seizure claim cannot succeed because there was no showing that the DHS social worker falsified the affidavit she submitted to the court or that the removal order would not have been granted without her questioned statements. The father's substantive due process claim cannot go forward because DHS's conduct does not "shock the conscience." And finally, the father's procedural due process claim cannot prevail because the father was in fact provided with adequate process—the same process that ultimately cleared his name. Accordingly, we affirm the judgment of the district court.

**II. Background Facts and Proceedings.**

Because we are reviewing a motion for summary judgment, we set forth the facts in the light most favorable to the plaintiff. *See Minor v. State*, 819 N.W.2d 383, 389 (Iowa 2012).

This case has its origins in a hostile divorce proceeding and custody battle between Andrew Lennette and his former wife, Holly. During their marriage, they

had three children together: C.L., a son born in 2004; O.L., a son born in 2006; and S.L., a daughter born in 2009.

By August 2014, Lennette's marriage had deteriorated drastically. In September, Holly took the three children and went to Arkansas to stay with her parents. In response, Lennette filed for dissolution of marriage and asked the court to order Holly to immediately return the children back to Cedar Rapids. That request was granted, and Holly returned. On September 23, the court decided that, for the time being, there would be joint legal custody of the children without a primary physical caretaker. Both Lennette and Holly continued to reside in the family home.

Throughout that fall, Lennette found himself accused by Holly of infidelity and physically abusive behavior. Holly also made multiple appointments with different doctors and therapists for herself and the children. Lennette alleges that Holly was searching for a healthcare provider who would support her escalating accusations against him. But no sexual abuse allegations surfaced during this time period.

On January 5, 2015, Holly sent an email to a therapist at Grace C. Mae Advocate Center (GCM), where Holly and all three children had received therapy services. The email included a document written by Holly and titled, "Things I've Thought Are Strange, Bad or Inappropriate." The document raised allegations of troubling behavior against Lennette, including allegations that strongly implied sexual abuse. The next day, S.L. had a therapy appointment at GCM in which

S.L. said that her brothers sometimes hit her in private areas. But when asked if anyone else touched her private areas, S.L. confidently said, "No."

On January 12, Holly went back to GCM. She stated that S.L. had made detailed allegations of sexual abuse to her two days earlier. A GCM therapist told Holly to report the abuse. DHS received a report of sexual abuse from GCM that day. Later in the evening, Holly took S.L. to an emergency room to be evaluated. S.L. was not questioned during that visit, but Holly was interviewed and recounted what she had told GCM. The physician's assistant who heard Holly's story called the allegations "questionable" in his report and later testified that he "had some doubts," primarily because Holly's demeanor seemed "inappropriate" for the situation.

The next day, on January 13, Holly took S.L. to be examined and interviewed at the St. Luke's Child Protection Center (CPC). S.L.'s physical exam at the CPC showed no evidence of abuse. But during her forensic interview, S.L. made serious allegations of sexual abuse. The report authored by the interviewer did not include an assessment of S.L.'s credibility. S.L.'s brothers were also interviewed at the CPC two days later and denied having been sexually abused.

Melody Siver, a DHS caseworker, was assigned to be the primary investigator of the report concerning Lennette. Amy Howell supervised Siver, and Valerie Lovaglia supervised both Siver and Howell. All three DHS employees were subsequently named as defendants in this case.

Siver observed the CPC forensic interviews of the children, including the interview where S.L. made accusations of sexual abuse against Lennette. She

also separately interviewed Holly. Siver found S.L.'s CPC interview to be credible. Thus, on January 16, she submitted an affidavit to the Linn County District Court as follows:

> There is a current assessment . . . alleging sexual abuse of [S.L.] by her father, Andrew Lennette. [S.L.] was interviewed at the Child Protection Center and reported sexual abuse by her father on more than one occasion. She had knowledge that a child of her age could not know otherwise. I found her interview to be credible. [S.L.] has exhibited some sexualized behaviors recently.

Siver later admitted that the information about "sexualized behaviors" came exclusively from Holly.

Siver's affidavit concluded, "[I]t is believed that the children is(are) at risk of their health and safety as well as to prevent further risk of abuse, this worker respectfully requests that Andrew Lennette be Court Ordered to leave the residence in order for the children to remain in their home."

That day, the juvenile court issued an ex parte order that Lennette be removed from the family home and have no contact with the minor children. The court set a review hearing for one week later on January 23.

The Cedar Rapids Police Department (CRPD) and DHS contacted Lennette to request interviews from him concerning the allegations. Through his attorney, Lennette declined these requests. Lennette appeared at the January 23 hearing with his attorney but informed the court that he was not ready to proceed. He waived his right to a speedy hearing. He also agreed to continue the no-contact order on the condition that he could have visitation with his sons. Lennette asked for and received a copy of the DVD of S.L.'s CPC interview.

In the following weeks, Lennette's attorneys provided DHS with lists of potential witnesses, affidavits from potential witnesses, records from the divorce proceeding, and other exculpatory records and information. DHS did not follow up on this information. Around the beginning of February, Lennette replaced his attorney. Also during this timeframe, the CRPD decided not to pursue criminal charges against Lennette, although Siver contends she was not aware of this decision at the time.

On February 17, Lennette and his new attorney met with Siver and her supervisor Amy Howell. In the interview, Lennette vigorously denied the allegations and maintained that S.L.'s interview seemed theatrical and that she was repeating things she didn't understand or believe.

DHS still had not determined whether the allegations of sexual abuse were founded or not. It therefore kept the matter on "addendum" status. Meanwhile, S.L. was receiving ongoing therapy at GCM. In therapy, S.L. continued to state that Lennette had molested her, although she made these statements in the presence of her mother. On March 12, Siver spoke to S.L.'s therapist at GCM, who stated that she did not recommend S.L. have visits with her father because it would be detrimental to her progress. The next day, DHS made a determination that the allegation of sexual abuse against Lennette was founded.

That same day, Lennette filed a renewed and amended emergency application to vacate the no-contact order and the order requiring him to leave the family home. On March 24, Lennette moved to expunge the abuse finding. Trial was set for April 6 and 7 on these motions.

The summary judgment record does not reveal why, but the trial that began on April 6 did not finish immediately. Instead, it proceeded off and on throughout the spring and summer. In total, approximately seventeen witnesses testified. On December 23, the juvenile court issued a detailed ruling determining that the sexual abuse allegation was "unfounded and should be expunged from the central registry." The court declined to adjudicate the children as in need of assistance and found that no additional services were needed through the juvenile court. The court added that it did not "have services to remedy the problem of the animosity between the parents other than to hope for a speedy divorce."

In September 2016, the dissolution proceeding concluded with a final decree. Lennette was granted sole physical care of the children.

Thereafter, Lennette, individually and on behalf of his children, brought this action in the Linn County District Court against the State, Siver, Howell, and Lovaglia.[1] His claims centered on DHS's failure to adequately investigate the claimed sexual abuse before presenting it to the juvenile court and determining that it was founded:

> 78. Before approaching the court, Ms. Siver made no effort to speak with Grace C. Mae or any other health care provider, including the ER staff, to corroborate the accuracy and consistency of the history being provided by Holly or S.L.

---

[1]As required by the Iowa Tort Claims Act, Lennette first presented his claims to the State Appeal Board. *See* Iowa Code § 669.5(1). He withdrew them once the six-month waiting period had elapsed. *Id.*

We will refer to the government defendants hereafter collectively as "the State."

79. Before approaching the court, Ms. Siver made no effort to research the history involving the divorce, nor to speak with Andy to determine the reliability of any of the information being provided by Holly.

80. In her Affidavit, Ms. Siver made the following false statement: "[S.L.] had knowledge that a child of her age would not know otherwise." This was directly contradicted by the CPC interview.

81. In her Affidavit, Ms. Siver made the following false statement: "[S.L.] has exhibited some sexualized behaviors recently."

82. In addition to the false statements made by Ms. Siver, there was a failure by the IDHS investigators to provide the court with significant exculpatory information, primary being the fact that the parents had gone through the divorce process, no allegations of physical or sexual abuse had been made, the court had held a hearing in the divorce and had ordered that both parents have joint custody, and the court had allowed Andy to remain in the home.

. . . .

102. On March 13, 2015, the Department completed its report and issued a report of "founded" sexual abuse of S.L. by Andy. This finding was made despite making no effort to investigate after January 26, 2015 and without contacting any of the people or reviewing any of the documents provided by Andy.

The State initially filed a motion to dismiss. The district court dismissed the negligence and breach of fiduciary duty claims, reasoning that DHS's governing statutes did not create a common law duty. The court denied the motion as to all other claims, noting it was "extremely reluctant to dispose of this case on a motion to dismiss." The court added, "When the evidence in this case has been further developed and if the court is then presented with a summary judgment motion, the court may or may not reach the same conclusions."

The State sought interlocutory review of the partial denial of its motion to dismiss. We granted the application for interlocutory review, and we transferred

the appeal to the court of appeals, which affirmed the district court's ruling. *See Lennette v. State*, No. 17–2019, 2018 WL 6120049, at *3–4 (Iowa Ct. App. Nov. 21, 2018).

Back in the district court, this action was consolidated with a separate action brought by Lennette against GCM and the CPC. Lennette later dismissed the CPC with prejudice, and GCM obtained summary judgment.

On April 21, 2020, the State moved for summary judgment on Lennette's remaining claims alleging tortious interference with the parent–child relationship, intentional infliction of emotional distress, and constitutional violations. The State asserted both that Lennette's claims failed as a matter of law and that they were barred by various immunities and defenses. On August 12, the district court issued a lengthy ruling granting summary judgment on several overlapping grounds.

First, the court concluded that the State was entitled to absolute immunity because the DHS employees were acting as "ordinary witnesses" whose actions were "intimately associated with the judicial process."[2] Alternatively, qualified immunity was available as to the constitutional claims because the DHS employees did not violate any clearly established constitutional right.

Next, the court determined that the State had sovereign immunity under the discretionary function exception to the Iowa Tort Claims Act (ITCA). *See* Iowa Code § 669.14(1) (2017) (excluding the performance of a discretionary function

---

[2]The district court found there was no genuine issue of material fact as to whether Siver, Howell, and Lavaglia were acting at all relevant times within the course of their employment.

from the right of action granted in the ITCA). Alternatively, sovereign immunity was available because Lennette's claims were the functional equivalent of a misrepresentation or deceit claim. *See id.* § 669.14(4) (excluding claims arising out of misrepresentation and deceit from the right of action granted in the ITCA). The court explained, "[A]t their root, Plaintiffs' complaints are that Defendants misrepresented information about the alleged abuse, or engaged in deception in their statements to the juvenile court."

Further, the court held that statutory immunity was available under Iowa Code section 232.73. That section states, "A person participating in good faith in the making of a report . . . or aiding and assisting in an assessment of a child abuse report pursuant to section 232.71B, shall have immunity from any liability . . . ." *Id.* The court concluded that this provision covered the actions of the DHS employees.

Additionally, and in the alternative, the district court granted summary judgment to the State on the merits of Lennette's claims. It explained that tortious interference with custody was intended to provide a remedy when one parent interfered with the other parent's legal rights to a child, not when DHS employees filed affidavits with a juvenile court. Also, none of the alleged wrongful actions of the State met the "abducting, compelling, or inducing" element of a tortious interference claim. Turning to intentional infliction of emotional distress, the court concluded that actions at issue could "not reasonably be regarded as outrageous." Both common law claims therefore failed as a matter of law.

Moving to Lennette's direct claims under the Iowa Constitution, the district court rejected the claims under article I, section 1 and article I, section 8 on the ground that our court had not recognized such claims. Also, the court found that there had been no due process violation under article I, section 9: Lennette had received constitutionally adequate procedures, and the State had not taken "action that shocks the conscience or interferes with rights implicit in the concept of ordered liberty."

Lennette timely appealed, and we retained the appeal.

**III. Standard of Review.**

Summary judgment is granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R. Civ. P. 1.981(3). "We review a district court's summary judgment ruling for correction of errors at law." *Koster v. Harvest Bible Chapel–Quad Cities*, 959 N.W.2d 680, 687 (Iowa 2021). In doing so, "[w]e view the record in the light most favorable to the nonmoving party." *Id.* State constitutional claims are reviewed de novo. *Venckus v. City of Iowa City*, 930 N.W.2d 792, 798 (Iowa 2019).

**IV. Analysis.**

Lennette alleges that the State, through its child protection workers, committed common law torts and constitutional violations that resulted in his losing access to his children for almost a year, from January 16 to December 23, 2015. He alleges two common law torts: tortious interference with the parent–child relationship and intentional infliction of emotional distress. He also alleges four violations of the Iowa Constitution: inalienable rights (article I,

section 1), search and seizure (article I, section 8), and substantive and procedural due process (article I, section 9). The gist of his complaints is that DHS failed to conduct an adequate investigation, withheld exculpatory information from the court, and presented untrue information to the court.

As noted, the State argued below, and the district court agreed, that various immunities apply to Lennette's claims:

> 1. Judicial process immunity, which is an updated term for what used to be called prosecutorial immunity. *See Venckus*, 930 N.W.2d at 803; *Minor*, 819 N.W.2d at 397–98.

> 2. The discretionary function exception in the ITCA. *See* Iowa Code § 669.14(1).

> 3. The exception for claims arising out of misrepresentation and deceit in the ITCA. *See id.* § 669.14(4).

> 4. The statutory immunity for reporters set forth in Iowa Code section 232.72. *See Nelson v. Lindaman*, 867 N.W.2d 1, 8–9 (Iowa 2015).

The State also argued below, and the district court agreed, that all of Lennette's claims failed on the merits. After a close review of the facts as viewed in the light most favorable to Lennette, we believe that his claims cannot succeed on the merits, and, therefore, we do not reach the question of whether any immunities apply.

We do not write on a totally blank slate. A decade ago, in *Minor v. State*, we considered a mother's claims on behalf of herself and her daughter that two DHS workers had wrongfully caused her daughter to be removed from her care and custody and had negligently failed to prevent the child from abuse by a foster parent. 819 N.W.2d at 389. The mother wound up being separated from her

daughter for approximately three months, the duration of the CINA proceeding. *Id.* at 390–91. The mother asserted federal constitutional claims under 42 U.S.C. § 1983—but not state constitutional claims. *Id.* at 392. She also asserted state common law tort claims, including tortious interference with the parent–child relationship and intentional infliction of emotional distress. *Id.*

With respect to the state tort claims, we noted that "there is some debate as to whether Iowa recognizes a cause of action for tortious interference with the parent–child relationship." *Id.* at 404. Regardless, even assuming that such a cause of action existed in Iowa, we held all tort claims that had been presented to the state appeal board were barred because they were the functional equivalent of misrepresentation and deceit. *Id.* at 407–08; *see* Iowa Code § 669.14(4). As we stated,

> [T]he basis of their claim is that, to intentionally inflict emotional distress and interfere with their parent–child relationship, [the social worker] obtained false information from [a third party], communicated the false information to the district court, and the district court relied on it in deciding to remove [the daughter] from [the mother's] custody.

*Minor*, 819 N.W.2d at 407.

As to the federal constitutional claims, we determined that absolute immunity protects social workers when they recommend that prosecutors initiate legal proceedings or when they file affidavits as ordinary witnesses, but not when they investigate cases or file affidavits as complaining witnesses. *Id.* at 398–99. Nevertheless, to the extent the mother's claims were not barred by absolute immunity, we found they were barred by qualified immunity because one DHS worker's complaining witness affidavit contained "information obtained

during previous investigations conducted in good faith" and there was no evidence that the other DHS worker allowed the daughter to continue in a foster care placement that he knew to be dangerous or otherwise unfit. *Id.* at 401, 404. Accordingly, we affirmed the summary judgment that had been granted to the defendants. *Id.* at 408.

Although we decided the *Minor* case based on ITCA exceptions, absolute immunity, and qualified immunity, we do not reach those issues in the present case. As noted, we believe the present case can be resolved on the straightforward ground that Lennette's specific claims for damages lack legal and evidentiary support as a matter of law.

**A. Intentional Interference with the Parent–Child Relationship.** Even though *Minor* discerned "some debate," it seems clear to us that Iowa recognizes a tort of intentional interference with the parent–child relationship. *Id.* at 404. In *Wood v. Wood*, we discussed the tort at some length and said, "The claim for interference with custody rights appears to have been recognized in every jurisdiction which has addressed the issue." 338 N.W.2d 123, 124–25 (Iowa 1983) (en banc). We reversed the district court's dismissal of a claim brought by one divorced parent against the other parent for interfering with that relationship by refusing to return their child. *Id.* at 123, 127. We concluded "that we should follow the majority of jurisdictions by recognizing and applying section 700 of the *Restatement*." *Id.* at 127.

Since *Wood* was decided, we have reaffirmed the tort twice: in 1989 and again in 2005. *See Lansky v. Lansky*, 449 N.W.2d 367, 368 (Iowa 1989); *Wolf v. Wolf*, 690 N.W.2d 887, 892 (Iowa 2005). In the 2005 case, we explained,

> To establish a claim of tortious interference with custody, a plaintiff must show (1) the plaintiff has a legal right to establish or maintain a parental or custodial relationship with his or her minor child; (2) the defendant took some action or affirmative effort to abduct the child or to compel or induce the child to leave the plaintiff's custody; (3) the abducting, compelling, or inducing was willful; and (4) the abducting, compelling, or inducing was done with notice or knowledge that the child had a parent whose rights were thereby invaded and who did not consent.

*Wolf*, 690 N.W.2d at 892.

The Second Restatement of Torts, which we relied upon in *Wood* and *Wolf*, characterizes the tort of intentional interference with the parent–child relationship as follows:

> One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent.

Restatement (Second) of Torts § 700, at 505 (Am. L. Inst. 1977).

We have not previously had to decide whether this tort can be pursued against a government social worker who allegedly conducts a slipshod investigation resulting in a judicial order depriving a parent of access to their child. Has such a worker "abduct[ed] or otherwise compel[led] or induce[d] a minor child to leave a parent"? *Id.* We think not, and some out-of-state precedents support this conclusion.

In *Nelson v. Green*, a federal district court rejected a father's attempt to apply this Restatement section to a fact pattern similar to ours. 965 F. Supp. 2d

732, 737–38 (W.D. Va. 2013). In the midst of a custody battle, the mother began alleging that the father had sexually abused the child. *Id.* at 737. Several therapists reported to a county caseworker that the allegations were false. *Id.* Nevertheless, the caseworker arranged for a "corrupt" evaluation that was "set up for the purpose of manufacturing a false disclosure of abuse." *Id.* at 738. The county then used that report to petition for a protective order and to issue a "founded" determination of sex abuse against the father that was later overturned. *Id.* at 738–39. The father had to undergo a thirteen-day trial to clear his name. *Id.* at 739.

The father brought, among other things, a claim for tortious interference with the parent–child relationship. *Id.* at 754. The nub of the claim was that "Defendants breached their duty to 'discharge their child protection responsibilities in a competent, objective, and fair manner[,]' resulting in Plaintiff's separation from his child." *Id.* (alteration in original). The court dismissed the claim. *Id.* at 754–55. The court quoted the language of Restatement (Second) of Torts section 700, emphasized that the tort contemplated separation of the parent from the child "*without due process of law*," and distinguished a prior case where a father had been allowed to pursue such a claim against private actors who arranged for his newborn child to be adopted in another state without his knowledge or involvement. *Id.* at 754–55.

In *Zamstein v. Marvasti,* the Connecticut Supreme Court relied on a similar analysis in declining to recognize a father's intentional interference claim against a reporting psychiatrist. 692 A.2d 781, 782–83 (Conn. 1997). The father and the

mother were in the midst of a divorce. *Id.* at 783. The mother, who accused the father of sexually abusing the children, retained a psychiatrist to evaluate the children. *Id.* The psychiatrist allegedly presented misleading information to the prosecutor by deleting exculpatory portions of his taped sessions with the children. *Id.* This resulted in a lengthy prosecution of the father before the father was acquitted. *Id.* Yet the court concluded there was no viable interference claim because the process was not "extralegal"; rather, it occurred through a court process in which the father participated:

> The plaintiff in the present case has failed to allege sufficient facts to state a cause of action for the tort of child abduction or custodial interference, . . . because the plaintiff did not allege any facts suggesting an unlawful custody of his children. In the absence of such an allegation, the trial court was correct in striking count four of the plaintiff's complaint. The defendant's acts were the alleged influencing of a judicial decision regarding custody, and were not some extralegal taking of custody as required for the tort of intentional interference of custodial rights.

*Id.* at 790.

We find the reasoning in these cases persuasive. Whatever the precise scope of the tort of intentional interference with the parent–child relationship, it requires something different from what happened here. The defendant must commit acts that can be fairly described as willfully "abducting, compelling, or inducing" the child to leave the parent's custody. *Wolf*, 690 N.W.2d at 892. The tort does not cover negligent investigations of a parent, or negligent submissions to a court, in connection with a child welfare proceeding. If Lennette's claim for tortious interference were allowed to go forward here, then potentially anyone who is jailed but later acquitted of a criminal offense could sue the investigators

and complaining witnesses for intentional interference with the parent–child relationship so long as the acquitted defendant happened to be the parent of a minor child. The district court appropriately granted summary judgment to the State on this claim.

**B. Intentional Infliction of Emotional Distress.** To succeed on a claim of intentional infliction of emotional distress, Lennette must demonstrate:

> (1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Barreca v. Nickolas*, 683 N.W.2d 111, 123–24 (Iowa 2004)). For intentional infliction of emotional distress cases, "it is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting *M.H. by and through Callahan v. State*, 385 N.W.2d 533, 540 (Iowa 1986)). The defendant's conduct must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Fuller v. Loc. Union No. 106 of United Broth. of Carpenters & Joiners of Am.*, 567 N.W.2d 419, 423 (Iowa 1997) (quoting *Harsha v. State Savs. Bank*, 346 N.W.2d 791, 801 (Iowa 1984)); *see also Smith*, 851 N.W.2d at 29 (finding the conduct sufficiently outrageous when the defendant's employee "engaged in unremitting psychological warfare against [the plaintiff] over a substantial period of time").

We think *Fuller v. Local Union No. 106 of the United Brotherhood of Carpenters & Joiners of America*, 567 N.W.2d 419, provides a helpful guidepost. There, the defendant filed a knowingly false police report that the plaintiff was driving while intoxicated, resulting in the plaintiff's being stopped on the highway. *Id.* at 421. That misconduct was deemed insufficiently extreme to survive summary judgment. *Id.* at 423. Here, there is no evidence that DHS made a knowingly false report, only that its investigation was inadequate.

Other courts have rejected intentional infliction of emotional distress claims against social workers in similar circumstances. *See Chen v. D'Amico*, 428 F. Supp. 3d 483, 514 (W.D. Wash. 2019) (granting summary judgment in favor of state department of human services employees on claims brought by parents who were separated from the child, and noting that "[w]ithout opining on how Ms. Danner and Ms. Kegel could have done their jobs better, no reasonable jury could find that their actions were so outrageous in character, and so extreme in degree, as to go beyond 'all possible bounds of decency' "); *Bass v. S.C. Dep't of Soc. Servs.*, 780 S.E.2d 252, 260–61 (S.C. 2015) (finding that social workers' grossly negligent conduct in separating children from their parental home based on subsequently discredited allegations of "parental poisoning" did not support a claim for intentional infliction of emotional distress). We uphold the grant of summary judgment on this claim.

**C. Inalienable Rights.** The inalienable rights clause of the Iowa Constitution provides,

> All men and women are, by nature, free and equal, and have certain inalienable rights — among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

Iowa Const. art. I, § 1.

Lennette asserts that the facts of this case show a violation of the inalienable rights clause. But the sum total of Lennette's inalienable rights argument is that specific DHS workers acted arbitrarily and capriciously. This is fundamentally a due process argument. An evaluation of the procedures followed in this case is not a substantive claim under article I, section 1, but is really a due process claim. We will therefore evaluate Lennette's inalienable rights claim under the rubric of due process.

**D. Unreasonable Search and Seizure.** Lennette contends that the actions of the DHS workers amounted to an unreasonable search and seizure of his person in violation of article I, section 8 of the Iowa Constitution. Courts have held that government social workers violate the Fourth Amendment to the United States Constitution when they remove children from a home without either court approval or sufficient exigent circumstances. *See, e.g.*, *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016) ("Under the Fourth Amendment, government officials are ordinarily required to obtain prior judicial authorization before removing a child from the custody of her parent."). Courts have also indicated that the Fourth Amendment is violated if a social worker makes an intentionally or recklessly false statement or omission to a judicial officer that results in a removal order. *See, e.g.*, *Marks v. Hudson*, 933 F.3d 481, 486 (5th Cir. 2019) ("It is also clearly established that a constitutional violation occurs if

an official makes a knowing, intentional, or reckless false statement or omission that causes the issuance of a warrant without probable cause that leads to the removal of a child from its parent's custody.").

We will assume without deciding that these same principles apply here, even though no child was removed and instead Lennette was ordered out of the home.[3] Regardless, the record does not show that Siver included any knowing or reckless falsehoods in her affidavit. Siver accurately recounted what S.L. had said in her forensic interview. Siver had observed that interview firsthand. Siver relayed her personal belief that S.L. was credible. Some of the other information that Siver included came from discussions with Holly, but for the most part, Holly was identified as the source of that information. Siver also informed the court that the couple was going through a divorce.

Lennette criticizes Siver for not getting additional corroboration before submitting her affidavit to the court. One can second-guess Siver's investigation, though, without treating it as a Fourth Amendment violation. There is nothing in the affidavit that would have been stricken at a hearing under *Franks v. Delaware*. *See* 438 U.S. 154, 171–72 (1978) (holding that when a challenger shows that the affiant has made intentionally or recklessly false statements, they must be stricken from the warrant application). *See, e.g.*, *McCullough v. Herron*, 838 F. App'x 837, 845 (5th Cir. 2020) (per curiam) (rejecting a Fourth Amendment claim where the social worker's "statement, even if assumed false,

---

[3]We note also that Lennette does not argue for a different standard to be applied under article I, section 8 as contrasted with the Fourth Amendment.

was immaterial to the court's finding of probable cause for medical neglect"); *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (applying the principles of *Franks* to an affidavit filed to secure a court order removing children from a home). Even if the statements that Lennette challenges had been stricken, we conclude that the ex parte order would have been issued anyway based on S.L.'s forensic interview describing sexual abuse and Siver's sworn statement that she found S.L. credible.

**E. Substantive Due Process.** Next we consider whether the conduct of the DHS workers violated substantive due process. When specific government conduct (as opposed to legislation) is alleged to have violated substantive due process, we typically apply the "shocks the conscience" standard to assess the claim. *See Behm v. City of Cedar Rapids*, 922 N.W.2d 524, 550 (Iowa 2019).

"A substantive due process violation is not easy to prove." *Blumenthal Inv. Trs. v. City of West Des Moines*, 636 N.W.2d 255, 265 (Iowa 2001). The claim "is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.' " *Id.* (omissions and alteration in original) (quoting *Rivkin v. Dover Twp. Rent Leveling Bd.*, 671 A.2d 567, 575 (N.J. 1996)). The conduct here does not shock the conscience.[4]

---

[4]Lennette urges us to abandon the "shocks the conscience" substantive-due-process test in light of our adoption of "all due care" qualified immunity in *Baldwin v. City of Estherville*, 915 N.W.2d 259, 280 (Iowa 2018). Lennette reasons that in any case where the plaintiff establishes a due process violation under the shocks-the-conscience test, clearly the defendants didn't exercise "all due care." And since we didn't intend to establish an unnecessary immunity in *Baldwin*, we must have intended to jettison the shocks-the-conscience test.

In *Parker v. Henry & William Evans Home for Children, Inc.*, the parents alleged that county caseworkers had violated substantive due process by "failing to conduct a reasonable investigation . . . prior to removing the children." 762 F. App'x 147, 157 (4th Cir. 2019). The United States Court of Appeals for the Fourth Circuit rejected the claim at the pleading stage, reasoning, "Where, as here, the defendants had some evidence of child abuse and attempted home visits in response to the complaint, their subsequent separation of the children is not conscience-shocking, particularly given that in cases of child abuse or neglect 'there often is no time to investigate.'" *Id.* (quoting *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 319 (4th Cir. 2009)).

Here, as in *Parker*, DHS had some basis for its actions. S.L. had been interviewed and had made serious allegations of sexual abuse against Lennette. After the ex parte order was obtained, Lennette could have insisted on an immediate hearing. Instead, Lennette initially agreed to continuation of the no-contact order and refused to be interviewed by DHS. DHS issued a "founded" determination only after S.L.'s therapist recommended that S.L. not have visits with Lennette. This is not conscience shocking.

The Second Circuit has clarified that a removal of a child with a "reasonable basis" is insufficient to violate the conscience-shocking standard as a matter of law. *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012). As the court put it,

---

However, the flaw in this argument is that we adopted all-due-care immunity in a case involving article I, section 8, not article I, section 9. *See id.* at 281. We did not say this immunity would necessarily play an active role in *every* constitutional tort case.

We have explained that, in part because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected.

*Id.* The court went on,

We agree with the district court that the removal of children from their parent for the purpose of keeping the children safe does not violate the parent's substantive due process rights if a post-removal judicial proceeding is promptly held to confirm that there exists a reasonable basis for the removal.

*Id.* at 153.

As already noted, S.L. had given a forensic interview accusing Lennette of child abuse. While the record suggests that Siver and Howell did not consider the exculpatory evidence and investigative leads submitted by Lennette, Lennette could have submitted that evidence *to the court* as early as January 23, 2015, one week after the no-contact order was entered. Lennette elected not to do so and instead agreed to continue the hearing on the merits.

Other federal authority supports the district court's dismissal of this claim. In *Halley v. Huckaby,* the Tenth Circuit likewise applied the shocks-the-conscience approach to a substantive due process claim alleging interference with the familial relationship. 902 F.3d 1136, 1155–56 (10th Cir. 2018). The court indicated that this standard "requires much more than mere negligence." *Id.* at 1155. "[T]he evidence . . . must show executive action by government officials so arbitrary and capricious that it amounts to conduct that shocks the conscience." *Id.* at 1156.

Recently, in *Stanley v. Hutchinson*, the Eighth Circuit found no substantive due process violation as a matter of law even though the DHS worker later testified that "when she prepared her 'find true' determination, she doubted having enough evidence to sustain it, but [a police officer] told her to find true even without an evidentiary basis, because the case was 'too political.'" 12 F.4th 834, 844 (8th Cir. 2021).[5] As the court put it, "[The parents] introduced no evidence that [the DHS worker's] find true determination and testimony in administrative and judicial proceedings were 'fabricated' or came anywhere near this level of conscience-shocking behavior." *Id.* at 844–45. The Eighth Circuit recognized this had been "a lengthy ordeal that may have been caused, at least in part, by overzealous government officials," but it nevertheless affirmed summary judgment for those officials. *Id.* at 845.

Similarly, in *Maddox v. Stephens*, the Eleventh Circuit applied the conscience-shocking standard in rejecting the substantive due process claim of a mother against a county social worker who had prepared a safety plan that separated the mother from her child. 727 F.3d 1109, 1113–17, 1126 (11th Cir. 2013); *see also A.J. v. Lancaster County*, 826 F. App'x 248, 250 (3d Cir. 2020) (explaining that the shocks-the-conscience standard is met only if the child welfare agency lacked "reasonable and articulable evidence giving rise to a reasonable suspicion that [[the child] had] been abused or [was] in imminent danger of abuse" (first and third alteration in original) (quoting *Mulholland v.*

---

[5]The case arose out of Arkansas and a "find true" determination appears to be analogous to a "founded" determination in Iowa. *See* 12 F.4th at 844.

*Government County of Berks,* 706 F.3d 227, 241 (3d Cir. 2013))); *Mitchell v. Dakota Cnty. Soc. Servs.,* 959 F.3d 887, 901 (8th Cir. 2020) ("Because removal of the children was based on a reasonable suspicion of child abuse and did not shock the conscience, the children have not established a viable substantive due process violation for their prolonged separation from [their father]."); *Miller v. City of Philadelphia,* 174 F.3d 368, 375–76 (3d Cir. 1999) ("We recognize that a social worker acting to separate parent and child does not usually act in the hyper pressurized environment of a prison riot or a high-speed chase. However, he or she rarely will have the luxury of proceeding in a deliberate fashion, as prison medical officials can. As a result, in order for liability to attach, a social worker need not have acted with the 'purpose to cause harm,' but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.' "); *Wolf,* 555 F.3d at 323 ("The conduct of the individual DSS defendants does not approach the level of shocking the conscience. DSS responded to a complaint suggesting the possibility of serious harm and proceeded to investigate and take steps to assure the safety of children that might have been in danger."); *Chen,* 428 F. Supp. 3d at 505 (noting that state officials must act with such deliberate indifference that their actions "shock the conscience" to support a substantive due process claim and that "Plaintiffs

have not submitted evidence of State Defendants' conduct that rises to the level of a substantive due process violation").[6]

We find this authority persuasive and conclude that Lennette has not established that the State committed a substantive due process violation.

**F. Procedural Due Process.** Lennette also claims that the State denied him procedural due process. We disagree. Iowa Code chapter 232 has procedures in place to protect parents from losing their children. All of the relevant procedures were afforded here. Indeed, Lennette was able to utilize those procedures to get his children back and clear his name. It was Lennette's decision not to go forward with an immediate post-removal hearing on January 23, 2015.[7]

Lennette faults the State for inadequately investigating S.L.'s allegations while taking nearly two months to deem them founded. But procedural due process generally does not guarantee that individual employees of the executive branch of government will move quickly or do their jobs well. What it does assure is a right to a meaningful hearing when constitutionally protected interests are invaded or threatened.

In *F.K. v. Iowa District Court for Polk County*, we upheld the basic review procedures at issue here. 630 N.W.2d 801, 809–10 (Iowa 2001). We found that

---

[6]Lennette directs us to *Akins v. Epperly,* a case against state patrol officers for wrongful arrest and detention that has nothing to do with parent–child relations. 588 F.3d 1178, 1182 (8th Cir. 2009). Even so, the Eighth Circuit rejected the plaintiff's substantive due process claim: "Akins highlights multiple errors and inconsistencies in Trammell's and Vaughan's investigation, but he has failed to show conscience-shocking reckless or intentional conduct." *Id.* at 1184.

[7]The Rules of Juvenile Procedure require this hearing to occur within ten days. *See* Iowa Ct. R. 8.12.

a statute allowing for ex parte removal orders followed by reasonably prompt adversary hearings did not violate procedural due process: "Given the emergency nature of temporary removal applications, a reasonably prompt post-removal hearing meets the twin goals of protecting the child's safety while preserving the parent's liberty interest. The legislature could reasonably err on the side of less formality where the safety of children is at issue." *Id.* at 810.

The relevant issue for the purposes of this claim is whether "the procedures available did not provide due process of law." *Dennis v. DeJong*, 953 F. Supp. 2d 568, 591 (E.D. Pa. 2013). As the court put it in *Dennis v. DeJong*, "There may be cases in which a child is justifiably removed from the home, without violating due process, even where a later investigation reveals no abuse actually occurred." *Id.* at 590; *see also Wolf*, 555 F.3d at 323 ("DSS's investigation, even if imperfect, did not deprive Wolf of due process by denying her the right to make her case."); *Mitchell v. Dakota Cnty. Soc. Servs.*, 357 F. Supp. 3d 891, 901 (D. Minn. 2019) (dismissing the procedural due process claim of a father who suffered temporary removal of his children from his custody due to the defendants' misconduct, unreliable accusations, and concealment where "there [were] no allegations of *any* omission of procedural safeguards"), *aff'd*, 959 F.3d 887.

Lennette was advised of his rights to challenge the January 16, 2015 ex parte no-contact order in court. He took advantage of those rights to vindicate his name and get his children back, although at a pace largely of his own choosing. *Cf. Isbell v. Bellino*, 962 F. Supp. 2d 738, 751–53 (M.D. Pa. 2013)

(finding a potentially viable procedural due process claim when the parents "were mired in a legal limbo, obliged to follow the terms of the safety plan imposed by the Defendants without any means of recourse for nearly five months"). No procedural due process violation occurred here.[8]

**V. Conclusion.**

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants.

**AFFIRMED.**

All participating justices concur. Appel, J., files a concurrence. McDonald, J., files a concurrence. Oxley, J., takes no part.

---

[8]In light of our disposition of the due process claims, and our previous discussion in part IV.C, we hold that Lennette's inalienable rights claim also fails.

**APPEL, Justice (concurring).**

A concurring opinion in this case states that *Godfrey v. State,* 898 N.W.2d 844 (Iowa 2017), was wrongly decided. In *Godfrey*, we determined that several provisions of the Iowa Bill of Rights were self-executing. *Id.* at 846–47, 871–72 (plurality opinion). In other words, a person claiming injury as a result of a constitutional violation could bring a claim against a constitutional wrongdoer seeking money damages. *Id.* at 871–72. The concurring opinion claims that *Godfrey* was "demonstrably erroneous." I emphatically disagree. Indeed, in my view, the notion that there may be constitutional wrongs without a remedy is the "demonstrably erroneous" doctrine.

First, the doctrine that there is "no right without a remedy" is a revered doctrine of common law. Duncan Kennedy, *The Structure of Blackstone's Commentaries*, 28 Buff. L. Rev. 209, 238–44 (1979) (establishing that *ubi jus, ibi remedium* (for every right a remedy) dominated Blackstone's law of wrongs). The common law maxim, however, was in tension with the concept of sovereign immunity. *See* Richard H. Fallon, Jr., *Bidding Farewell to Constitutional Torts*, 107 Calif. L. Rev. 933, 935, 942 (2019). But, as seen in the famous eighteenth century case *Wilkes v. Wood* (1763) 98 Eng. Rep. 489 (C.P.), immunity did not prevent civil rights claims for damages, including punitive damages, for the unconstitutional search and seizures by government agents ransacking homes looking for evidence of who was responsible for a disfavored publication. *See*

*State v. Ochoa*, 792 N.W.2d 260, 269–70 (Iowa 2010) (providing historic background of the *Wilkes* case).

One of the *Wilkes* damages cases, *Entick v. Carrington* (1765) 95 Eng. Rep. 807 (C.P.), was described by the United States Supreme Court as a "monument of English freedom" and considered to be "the true and ultimate expression of constitutional law." *Boyd v. United States*, 116 U.S. 616, 626 (1886), *overruled in part on other grounds by Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 302 (1967); *Ochoa*, 792 N.W.2d at 270 (providing historic background to the *Entick* case). In this ultimate expression of constitutional law, the *Wilkes* jury assessed a substantial damages verdict of 1,000 pounds. *Wilkes*, 98 Eng. Rep. at 499; *see Godfrey*, 898 N.W.2d at 866.

The *Wilkes* cases, forgotten today in some circles, were well known to colonists. *Ochoa*, 792 N.W.2d at 270. But the notion that the King could do no wrong was not part of the colonists' outlook, as demonstrated by the bitter resistance to the writs of assistance and general warrants so despised by John Adams and as brilliantly attacked by James Otis in Paxton's Case. Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review*, 77 B.U. L. Rev. 925, 946 (1997) (providing historic background of Paxton's Case).

Second, the point that wrongs deserve remedies was recognized by the great Chief Justice John Marshall in *Marbury v. Madison*, where he wrote, "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." 5 U.S. 137, 163 (1803). The provisions of article I of the Iowa Constitution, of course, are

part of "the laws." The notion in *Godfrey* is that when individuals are entitled to the protection of constitutional provisions and those provisions are violated, the individual is entitled to a cause of action for damages. 898 N.W.2d at 871–72.

Third, the Iowa Constitution notably included in its first substantive provision an inalienable rights clause. Iowa Const. art. I, § 1 ("All men and women are, by nature, free and equal, and have certain inalienable rights — among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness."). Under article I, section 1 of the Iowa Constitution, rights predated the Iowa Constitution and were "inalienable." If rights are inalienable, they must be subject to judicial enforcement. If the legislature could eviscerate the provision by refusing to enact implementing legislation, it would, in essence, render article I, section 1 a nullity and subject to control by the legislature, the very body from which the rights were designed to offer protection.

The fact that the first article of the Iowa Constitution details the Bill of Rights and not provisions related to the exercise of government power has not been recognized by current majorities on this court. And yet, it is a powerful indictor of the primary importance of preserving rights under the Iowa Constitution. *See* Bruce Kempkes, *The Natural Rights Clause of the Iowa Constitution: When the Law Sits Too Tight*, 42 Drake L. Rev. 593, 631 (1993) (noting the drafter's placement of the clause at the very beginning of the constitution strongly supports the argument that article I, section 1 should be given "substantive meaning"). The front and center placement of article I,

section 1 and the Iowa Bill of Rights generally demonstrates that the first principle of state government under the Iowa Constitution is the preservation of rights, a recognition that the cardinal responsibility of government is to protect the exercise of these rights, not invade them. *Hoover v. Iowa State Highway Comm'n*, 222 N.W. 438, 439 (Iowa 1928) ("Appearing . . . at the very threshold of the Iowa Bill of Rights, that constitutional safeguard is thereby emphasized and shown to be paramount."). Further, article I, section 1 acknowledges the basic and fundamental truth that certain inalienable rights are beyond the power of government to invade. In cases where this court expands the power of government, the sequence of the Iowa Constitution provisions is inverted, with legislative power in article III leapfrogging article I provisions.

Fourth, the Iowa caselaw with respect to enforceability of provisions in the Bill of Rights found in state constitutions developed around the turn of the twentieth century. In Iowa, we considered a claim for damages against an officer who conducted a search without a warrant in *McClurg v. Brenton*, 98 N.W. 881, 881–82 (Iowa 1904). Here, we emphasized the right of citizens to enjoy their home is embodied in "every bill of rights defining the limits of governmental power." *Id.* at 882.

Later, in *Krehbiel v. Henkle*, we noted that the right of a person to be secure from wrongful searches was "zealously safeguarded and has express recognition in our state Constitution" and that it was "thoroughly well settled" that "a violation of this right without reasonable ground therefor gives the injured party a right of [damages]." 121 N.W. 378, 379–80 (Iowa 1909). Ah, a right to damages

for a constitutional violation. Sounds like the judges in the *Wilkes* cases. And Chief Justice John Marshall, too.

If there was any ambiguity about a claim for damages arising from search and seizure violations in *McClurg* and *Krehbiel* (there isn't), the matter was resolved in *Girard v. Anderson*, 257 N.W. 400 (Iowa 1934). In that case, we declared, "A violation of the state and federal constitutional provisions against the unreasonable invasion of a person's home gives the injured party a right of action for damages for unlawful breaking and entering." *Id.* at 403. Note *Girard* stated that it was a "violation of the state and federal constitutional provisions" that gave rise to the claim. *Id.* So, the notion that provisions of the Iowa Constitution gave rise to a cause of action for damages without legislative action was in the Iowa legal waters more than a hundred years before *Godfrey*.

Fifth, over fifty years ago, the United States Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics* emphatically established a cause of action for damages caused by unconstitutional conduct of government officials. 403 U.S. 388, 395–97 (1971). This is so because "[a]n agent acting . . . in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own." *Id.* at 392. The Court noted the fact that damages may be available for Fourth Amendment violations "should hardly seem a surprising proposition" since damages have historically been considered an "ordinary remedy" for liberty violations. *Id.* at 395–96. It is undeniably true that the recent rights-restricting majorities on the United States Supreme Court have curtailed the scope of a

*Bivens*-style claim. *See, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 749–50 (2020) (holding that *Bivens* does not extend to claims against executive officials brought by foreign nationals); *Wilkie v. Robbins*, 551 U.S. 537, 561–62 (2007) (holding landowner did not have *Bivens* cause of action against Bureau of Land Management employees); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) (holding no *Bivens* cause of action exists against private corporation engaged in federal action). But the departures of the United States Supreme Court do not undercut the essential rationale in *Bivens*.

Sixth, the concurring opinion in *Bivens* of that great conservative of the Warren Court era, John Marshall Harlan, is particularly perceptive. Justice Harlan emphasized that English common law recognized damages claims for violation of charters and constitutions. *See Bivens*, 403 U.S. at 403–05 (Harlan, J., concurring). And, Justice Harlan rejected the notion that legislation was needed to provide a remedy, observing that the Bill of Rights was "intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." *Id.* at 407. Further, Justice Harlan echoed Justice Marshall in observing that at the time of the United States Constitutional Convention, "modes of jurisprudential thought which appeared to link 'rights' and 'remedies' in a 1:1 correlation." *Id.* at 400 n.3.

Seventh, both before and after *Bivens*, a number of state courts have found that provisions of the bill of rights in their state constitutions were self-executing. The cases spread upon the pages of the national reporter system embracing the notion of self-executing state constitutional provision prior to *Godfrey* include

*Gay L. Students Ass'n v. Pac. Tel. & Tel. Co.*, 595 P.2d 592, 602 (Cal. 1979), *superseded by statute on other grounds*, Cal. Gov. Code § 12940(a)–(d), (j), *as recognized in In re Marriage Cases*, 183 P.3d 384, 437 n.56 (Cal. 2008); *Binette v. Sabo*, 710 A.2d 688, 693 (Conn. 1998); *Newell v. City of Elgin*, 340 N.E.2d 344, 349 (Ill. App. Ct. 1976); *Moresi v. State ex rel. Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1092–93 (La. 1990); *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 111 (Md. 2000); *Widgeon v. E. Shore Hosp. Ctr.*, 479 A.2d 921, 927–28 (Md. 1984); *Phillips v. Youth Dev. Program, Inc.*, 459 N.E.2d 453, 457 & n.4 (Mass. 1983); *Johnson v. Wayne County*, 540 N.W.2d 66, 69–70 (Mich. Ct. App. 1995); *Stringer v. State*, 491 So. 2d 837, 849 (Miss. 1986) (en banc) (Robertson, J., concurring); *Mayes v. Till*, 266 So. 2d 578, 580 (Miss. 1972); *Dorwart v. Caraway*, 58 P.3d 128, 136–37 (Mont. 2002); *Jackson v. Consol. Rail Corp.*, 538 A.2d 1310, 1319 (N.J. Super. Ct. App. Div. 1988); *Strauss v. State*, 330 A.2d 646, 649 (N.J. Super. Ct. Law Div. 1974); *Brown v. State*, 674 N.E.2d 1129, 1137–38, 1144 (N.Y. 1996); *Corum v. Univ. of N.C. ex rel. Bd. of Governors*, 413 S.E.2d 276, 289–90 (N.C. 1992); *Jones v. Mem'l Hosp. Sys.*, 746 S.W.2d 891, 893–94 (Tex. App. 1988); *Old Tuckaway Assocs. Ltd. P'ship v. City of Greenfield*, 509 N.W.2d 323, 328 n.4 (Wis. Ct. App. 1993).

The above cases offer a veritable cornucopia of reasoning, but a succinct statement was provided in *Brown*:

> The underlying rationale for the decision, in simplest terms, is that constitutional guarantees are worthy of protection on their own terms without being linked to some common-law or statutory tort, and that the courts have the obligation to enforce these rights by

> ensuring that each individual receives an adequate remedy for violation of a constitutional duty.

674 N.E.2d at 1138.

Eighth, modern scholarly authority recognizes the need for effective remedies for violations of constitutional provisions. For example, the Restatement (Second) of Torts, section 874A, makes a clear statement that a remedy will be implied for violations of constitutional provisions where such a remedy is needed to assure effectiveness of the provision. *See* Restatement (Second) of Torts § 874A & cmt. *a* (Am. L. Inst. 1979). Further, many scholarly authorities support the notion that bill of rights provisions in state constitutions should be self-enforced without legislative action. *See, e.g.*, Susan Bandes, *Reinventing* Bivens*: The Self-Executing Constitution*, 68 S. Cal. L. Rev. 289, 340–41 (1995); David Schuman, *The Right to a Remedy*, 65 Temp. L. Rev. 1197, 1200–01 (1992).

And ninth, prior to *Godfrey*, a federal district court was twice called upon to determine whether the Iowa Supreme Court would recognize that search and seizure provisions of the Iowa Constitution were self-executing. In *McCabe v. Macaulay*, the United States District Court for the Northern District of Iowa considered whether the Iowa Supreme Court would recognize a *Bivens* action under the state constitution. 551 F. Supp. 2d 771, 785 (N.D. Iowa 2007). The court predicted that we would. *Id.* (noting that when faced with a new state constitutional claim, the Iowa Supreme Court often looks to decisions of the United States Supreme Court and other state courts of last resort, and pointing out that the United States Supreme Court recognized a direct cause of action in

*Bivens*). Similarly, in *Peters v. Woodbury County*, the same court came to the same conclusion. 979 F. Supp. 2d 901, 971 (N.D. Iowa 2013).

The concurring opinion would not apply stare decisis with respect to *Godfrey*. I think the doctrine should be fully applicable to *Godfrey*. In cases involving individual rights, stare decisis has as much applicability as in other cases.

Finally, I am concerned that the Iowa Supreme Court is moving away from its celebrated history and is adopting the rights-restricting views of the United States Supreme Court. But our Iowa founders followed the philosophy of George Ells and friends, who so believed that the Bill of Rights was the most important aspect of the Iowa Constitution that they put it front and center in the document, with the inalienable rights provision at the front of the line. *See* 1 *The Debates of the Constitutional Convention of the State of Iowa* 103 (W. Blair Lord rep., 1857), http://publications.iowa.gov/7313/1/The_Debates_of_the_Constitutional_Convention_Vol%231.pdf ("[T]he Bill of Rights is of more importance than all the other clauses in the Constitution put together, because it is the foundation and written security upon which the people rest their rights.").

While the historical Iowa Supreme Court has been recognized for refusing to accept the prevailing rights-restricting Supreme Court doctrine, *see* Brent Appel, Clark v. Board of School Directors, 67 Drake L. Rev. 237, 244–45 (2019), our recent cases seem to have adopted an approach that does not place primacy on the protection of individual rights but instead seeks to expand the reach of governmental power. *See, e.g.*, *State v. McGee*, 959 N.W.2d 432, 445 (Iowa 2021)

(authorizing warrantless blood tests); *State v. Tucker*, 959 N.W.2d 140, 147 (Iowa 2021) (limiting appeals following guilty plea); *State v. Warren*, 955 N.W.2d 848, 864–66 (Iowa 2021) (sustaining seizure arising from completed parking violation); *State v. Brown*, 930 N.W.2d 840, 846–48 (Iowa 2019) (permitting pretextual and warrantless automobile stops); *Venckus v. City of Iowa City*, 930 N.W.2d 792, 800–03 (Iowa 2019) (extending judicial process immunity); *AFSCME Iowa Council 61 v. State*, 928 N.W.2d 21, 41 (Iowa 2019) (curtailing public employees' collective bargaining rights based on arbitrary and capricious line drawing); *Baldwin v. City of Estherville*, 915 N.W.2d 259, 281 (Iowa 2018) (discovering government immunity for unconstitutional conduct). Where the expansions of government power will ultimate lead remains to be seen. But one of the barriers to majoritarian excess is the ability of citizens to vindicate their constitutional rights through *Godfrey* claims.[9] It should not be discarded like an old shoe, but should be placed near the constitutional doorway to protect individual liberties adopted by the people of Iowa in the very first article of the Iowa Constitution.

---

[9]The concurring opinion does preserve money damages claims for search and seizure violations based upon common law precedent. In my view, the common law precedent supports a larger proposition reflected in *Godfrey*. In any event, as noted in *Brown v. State*, effective remedies for constitutional claims are not limited to historic common law claims. *See* 674 N.E.2d at 1140–41. The limitation of effective constitutional remedies to those with historic common-law provenance is a variant of the doctrine of "original intent" to which I do not subscribe. *See State v. Wright*, 961 N.W.2d 396, 421 (Iowa 2021) (Appel, J., concurring specially).

**McDONALD, Justice (concurring).**

I join in the opinion of the court. The court correctly determines there is no genuine issue of material fact to be tried and the defendants are entitled to judgment as a matter of law. I write separately, first, to address the defendants' request that the court reconsider its constitutional tort jurisprudence, second, to address the constitutional right secured by article I, section 8 of the Iowa Constitution to pursue nonconstitutional causes of action against government officials, and third, to address the application of article I, section 8 in criminal proceedings.

I.

Five years ago in *Godfrey v. State*, this court held the due process clause of the Iowa Constitution is self-executing and a plaintiff can pursue a constitutional tort claim for alleged violations of the same. *See* 898 N.W.2d 844, 871–72 (Iowa 2017). *Godfrey* was unprecedented. In the one hundred and sixty years between the adoption of the constitution and *Godfrey*, this court had never recognized a constitutional tort claim. And for good reason: there was and is no such cause of action. *See id.* at 882 (Mansfield, J., dissenting) ("I disagree with the notion that constitutional monetary damage claims are some kind of time capsule that the drafters of our constitution buried in 1857 and that can only be unearthed now through the legal acumen of this court. The time capsule hasn't been found until now because no one buried it in the first place.").

Lennette seeks to extend *Godfrey* in this case and requests this court recognize constitutional tort claims for alleged violations of the inalienable rights, seizure and search, and due process clauses of the Iowa Constitution. *See* Iowa Const. art. 1, §§ 1, 8, 9. The defendants request this court reject Lennette's request and instead overrule *Godfrey*. I would accept the defendants' request. As explained in the dissenting opinion in *Godfrey*, this court's creation of a constitutional tort was contrary to the text of the constitution and was not supported by precedent, custom, or tradition. *See* 898 N.W.2d at 881–99. *Godfrey* was demonstrably erroneous, and this court should overrule it. *See* Iowa Const. art. XII, § 1 (providing that "any law inconsistent" with the constitution "shall be void"); *see also Gamble v. United States*, 139 S. Ct. 1960, 1984 (2019) (Thomas, J., concurring) (stating that adhering to demonstrably erroneous constitutional precedent "disregards the supremacy of the Constitution and perpetuates a usurpation of the legislative power"); *State v. Kilby*, 961 N.W.2d 374, 386 (Iowa 2021) (McDonald, J., concurring).

## II.

Although I would overrule *Godfrey* and hold that there are no causes of action for money damages for alleged violations of the Iowa Constitution, I would recognize that the Iowa Constitution secures a right to assert nonconstitutional causes of action for money damages against government officials under certain circumstances. In particular, as relevant here, it appears that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches" is a guarantee of the right to assert

nonconstitutional causes of action for money damages against government officials for unlawful seizures and searches. Iowa Const. art I, § 8.

A.

The Iowa Constitution of 1857 is "the supreme law of the state, and any law inconsistent therewith, shall be void." *Id.* art. XII, § 1. While the constitution is the fundamental and supreme law of this state, it is also posited law. Like all posited law, the constitution was drafted and adopted at a specific time and was set sail on a sea of preexisting principles, statutes, precedents, customs, and practices that gave meaning and operational effect to the text. In interpreting and applying the constitution, this court is thus bound by the document's meaning in light of the authentic historical context in which it was launched:

> In proceeding to give construction to a provision of the Constitution, it is of importance that we begin by making ascertainment of the particular object intended to be subserved. To this end we are required primarily to look to the words employed, giving to them meaning in their natural sense and as commonly understood. If necessary to a fuller understanding, we may place ourselves in touch with the makers of the instrument, and share in their view of the general subject by reading the constitutional debates; also the contemporary legislation, if any, having relation to the subject-matter. We may take note of the evil as manifestly sought to be remedied or guarded against, and of the conditions to be affected, then existing or reasonably to be apprehended in the future, and as disclosed by the authentic history of the state.

*N.W. Halsey & Co. v. City of Belle Plaine*, 104 N.W. 494, 495–96 (Iowa 1905).

Although the historical approach to constitutional interpretation is contested by some, it has long been the law of this country. As the Great Chief Justice explained with respect to interpreting the federal constitution:

> To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be

understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them, nor contemplated by its framers;—is to repeat what has been already said more at large, and is all that can be necessary.

*Ogden v. Saunders*, 25 U.S. 213, 332 (1827) (Marshall, C.J., dissenting). The Supreme Court later clearly articulated this rule of interpretation, and I quote it at length:

> The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now. Being a grant of powers to a government, its language is general; and, as changes come in social and political life, it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. This in no manner abridges the fact of its changeless nature and meaning. Those things which are within its grants of power, as those grants were understood when made, are still within them; and those things not within them remain still excluded.
>
> . . . .
>
> It must also be remembered that the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men, dealing with the facts of political life as they understood them; putting into form the government they were creating, and prescribing, in language clear and intelligible, the powers that government was to take. Mr. Chief Justice Marshall, in *G[i]bbons v. Ogden*, 9 Wheat. 1, 188, 6 L. [E]d. 23, 68, well declared:
>
>> 'As men whose intentions require no concealment generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our Constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.'
>
> One other fact must be borne in mind, and that is that in interpreting the Constitution we must have recourse to the common

law. As said by Mr. Justice Matthews in *Smith v. Alabama,* 124 U.S. 465, 478:

> 'The interpretation of the Constitution of the United States [is] necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history.'

> And by Mr. Justice Gray in *United States v. Wong Kim Ark*, 169 U. S. 649, 65[5], 42 L. [E]d. 890, 892, 18 Sup. Ct. Rep. 456, 459:

> 'In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution. The language of the Constitution, as has been well said, could not be understood without reference to the common law.'

*South Carolina v. United States*, 199 U.S. 437, 448–50 (1905) (citations omitted), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

## B.

With that background, I turn to the right at issue. The right to be free from unreasonable seizures and searches is codified in article I, section 8 of the Iowa Constitution. It provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

The authentic historical context in which this right was codified reveals that the nature and scope of the right was to fix in place the common law regime of rights

and remedies governing seizures and searches and to prohibit legislative abrogation of the same.

1.

Under the rule of law "no man is above the law" and "every man, whatever be his rank or condition, is subject to the ordinary law of the realm and amenable to the jurisdiction of the ordinary tribunals." A.V. Dicey, *Introduction to the Study of the Law of the Constitution* 114 (Liberty Fund ed. 1982) [hereinafter Dicey]. "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen." *State v. Wright*, 961 N.W.2d 396, 400 (Iowa 2021) (quoting *Olmstead v. United States*, 277 U.S. 438, 485 (1928), *overruled by Katz v. United States*, 389 U.S. 347 (1967)).

The principle of the rule of law is part of our nation's constitutional inheritance. In England, "every official, from the Prime Minister down to a constable or a collector of taxes, [was] under the same responsibility for every act done without legal justification as any other citizen." Dicey at 114.

> From time immemorial many claims affecting the Crown could be pursued in the regular courts if they did not take the form of a suit against the Crown. . . . If the subject was the victim of illegal official action, in many cases he could sue the King's officers for damages.

Louis Jaffe, *Suits Against Governments and Officers: Sovereign Immunity*, 77 Harv. L. Rev. 1, 1–2 (1963) [hereinafter Jaffe]; *see also Money v. Leach* (1765) 97 Eng. Rep. 1075 (K.B.); *Entick v. Carrington* (1765) 19 How. St. Tr. 1029 (K.B.); *Wilkes v. Wood* (1763) 98 Eng. Rep. 489 (K.B.); *Huckle v. Money* (1763) 95 Eng. Rep. 768 (C.P.).

The principle of the rule of law and the concomitant right to pursue nonconstitutional causes of action against government officials crossed the Atlantic and was firmly anchored at the time of America's founding. *See Hernandez v. Mesa*, 140 S. Ct. 735, 748 (2020) ("[T]he traditional way in which civil litigation addressed abusive conduct by . . . officers was by subjecting them to liability for common-law torts."); Jaffe, 77 Harv. L. Rev. at 2 ("This was the situation in England at the time the American Constitution was drafted."). This principle informed the meaning of the federal and state constitutions at the time of the founding. Andrew Kent, *Lessons for* Bivens *and Qualified Immunity Debates from Nineteenth-Century Damages Litigation Against Federal Officers*, 96 Notre Dame L. Rev. 1755, 1777–78 (2021).

### 2.

By the time the citizens of Iowa ratified the Iowa Constitution in 1857, it was well established throughout the country that government officials could be, and regularly were, subject to nonconstitutional causes of action for monetary damages. With respect to seizures or searches in particular, government officials were subject to nonconstitutional causes of action for money damages for seizures and searches that were unlawful, tortious, or otherwise prohibited, subject to a defense of justification made pursuant to a valid warrant or other legal process. *See, e.g., Johnson v. Tompkins*, 13 F. Cas. 840, 849 (C.C.E.D. Pa. 1833) (No. 7,416) (holding that a warrant obtained in violation of the constitution was void and could not serve as a defense in an action for assault and false arrest); *Reed v. Legg*, 2 Del. (2 Harr.) 173, 174–76 (1837) (stating that in an

action for trespass, "the search warrant justifie[d] the entry of the officer"); *Simpson v. Smith*, 2 Del. Cas. 285, 290 (1817) (providing that in an action for trespass, "[t]he warrant protected the officer"); *Reed v. Rice*, 25 Ky. (2 J.J. Marsh.) 44, 45–47 (1829) (stating that an official asserting justification for trespass under legal process must show valid process); *Larthet v. Forgay*, 2 La. Ann. 524, 525–26 (1847) (affirming judgment in plaintiff's favor in trespass action where officers exceeded the scope of a search warrant); *Sandford v. Nichols*, 13 Mass. 286, 288–90 (1816) (stating, in a case alleging trespass, that "the defendants could have justified the acts complained of by showing a regular warrant from a magistrate having jurisdiction over the subject"); *Mayo v. Wilson*, 1 N.H. 53, 54 (1817) (asserting justification in response to suit for unlawful arrest); *Beaty v. Perkins*, 6 Wend. 382, 386 (N.Y. Sup. Ct. 1831) ("[T]he action cannot be sustained. The warrant having been legally and regularly issued, and duly executed in the daytime, is a protection to those who executed it, in an action of trespass." (emphasis omitted)); *Sailly v. Smith*, 11 Johns. 500, 503 (N.Y. Sup. Ct. 1814) ("Cases, however, may occur when the officer may act unwarrantably, by proceeding without probable cause, to break open a dwelling-house. His conduct, in such a case, would make him liable, notwithstanding the law, to remunerate in damages to the owner of the house. When, therefore, such suspicions exist, it would be a more correct course for him to apply to a magistrate, whose warrant would effectually protect him, and prevent the necessity of showing probable cause, afterwards, by other testimony."); *Bell v. Clapp*, 10 Johns. 263, 265 (N.Y. Sup. Ct. 1813) (per curiam) (holding marshals

50

and constable were entitled to judgment where presenting search warrant as justification to trespass); *Gardner v. Neil*, 4 N.C. 104, 104 (1814) ("Every entry by one, into the dwelling-house of another, against the will of the occupant, is a trespass, unless warranted by such authority in law as will justify the entry."); *Steel v. Fisk*, Brayt. 230, 231 (Vt. 1816) (holding a search warrant supported an inspector's justification defense in an action for stolen goods); *Wells v. Jackson*, 17 Va. (3 Munf.) 458, 479 (1811) ("This requisite degree of certainty in all warrants, is not only necessary for the security of the citizens, against the mistakes, oppression, or misjudgment of subordinate officers, but is also necessary in behalf of those officers themselves. They are justified if they act in obedience to the warrant.").

Iowa's earliest precedents were in accord with the national consensus. Iowa law allowed "traditional common law tort claims, such as trespass, conversion, malicious prosecution, and abuse of process" to be asserted against government officials. *Godfrey*, 898 N.W.2d at 887. Under Iowa law, plaintiffs could seek nominal, actual, and punitive damages against offending officials and their sureties for their unlawful conduct. *See Wright*, 961 N.W.2d at 406; *McClurg v. Brenton*, 98 N.W. 881, 883 (Iowa 1904) ("If the jury should find for plaintiff—that the wrongful search was made . . . —they could, in addition to actual damages, assess a greater or less sum against the defendants by way of punishment or as exemplary damages."); *Yount v. Carney*, 60 N.W. 114, 115–16 (Iowa 1894) ("The arrests and detentions of the plaintiff were in the presence of a number of persons, and in public places of the town. At the last arrest the

plaintiff's person was searched, and his private papers examined. Mental suffering and injury to feelings are proper to be considered in assessing damages in such cases. We think, under the evidence, the question of damages should have been submitted to the jury." (citation omitted)); *Holmes v. Blyler*, 45 N.W. 756, 756 (Iowa 1890) (holding good faith was not a defense to liability in false arrest action but could be advanced to mitigate damages); *Tieman v. Haw*, 49 Iowa 312, 315 (1878) ("The sureties of a sheriff are liable for a trespass committed by their principal in attempting to discharge his duty as an officer."); *Strunk v. Ocheltree*, 11 Iowa 158, 159–60 (1860) ("The defendant [constable] levied upon the property and took possession of it by virtue of his office, and sold the same when he had no right to do so. . . . The wrong was committed by color of his office, a wrong which his sureties obligated themselves he would not do, and for which they should be held responsible."); *Plummer v. Harbut*, 5 Iowa (5 Clarke) 308, 314 (1857) ("If defendants, in executing the process, acted in good faith, and in their entry upon plaintiff's premises, were guilty of no oppression, and made no disturbance, further than was necessary in making the seizure, the trespass, even if without authority, was nominal only, and nominal damages must limit the extent of his recovery.").

And, under Iowa law, government officials could assert a justification defense to these causes of action pursuant to a valid warrant or other process. *See, e.g., Chambers v. Oehler*, 77 N.W. 853, 854–55 (Iowa 1899) (holding a justice of the peace could be held liable for false imprisonment when plaintiff was arrested based on subpoena that justice had no authority to issue); *Bradley v.*

*Miller*, 69 N.W. 426, 426 (Iowa 1896) ("It is elementary doctrine that the levy of an attachment upon the property of a stranger to the writ is a trespass on the rights of the owner, who may maintain either trover, trespass, or replevin, not only against the officer serving the writ, but also against the plaintiff in the suit."); *Yount*, 60 N.W. at 114–16 (holding plaintiff had stated a cause of action for false imprisonment against a marshal where plaintiff had been wrongly arrested for horse theft); *Morgan v. Zenor*, 55 N.W. 197, 198 (Iowa 1893) (holding plaintiff could not maintain an action for replevin against a sheriff where the goods in question were seized pursuant to valid process); *Carpenter v. Scott*, 53 N.W. 328, 329 (Iowa 1892) (allowing exemplary damages against an officer for unlawful seizure of property); *Wert v. Potts*, 41 N.W. 374 (Iowa 1889) (considering claims by plaintiff that he was assaulted and battered by officers during the course of an arrest of a third party); *State v. Ward*, 36 N.W. 765, 767 (Iowa 1888) (stating a constable may have committed a trespass when he seized liquor from a railcar without a warrant); *Clancy v. Kenworthy*, 35 N.W. 427, 428 (Iowa 1887) (upholding verdict finding a constable liable for false imprisonment, excessive force, and malicious prosecution); *Arneson v. Thorstad*, 33 N.W. 607, 608–09 (Iowa 1887) (upholding verdict in favor of defendant constable for false imprisonment and oppressive conduct in connection with an arrest); *Montgomery v. Sutton*, 25 N.W. 748, 749 (Iowa 1885) (reversing judgment in favor of plaintiff against a marshal for false imprisonment and malicious prosecution where marshal had reasonable grounds to make arrest and plaintiff had resisted arrest); *Lanpher v. Dewell*, 9 N.W. 101, 102 (Iowa 1881) (stating a justice of the

peace could be liable for false imprisonment for ordering plaintiff's confinement "without authority or jurisdiction"); *Greet v. Talbot*, 36 Iowa 499, 500 (1873) (holding that the mayor of the town could not be held liable for false imprisonment where the mayor believed erroneously, but in good faith, that the town ordinance allowed the mayor to jail plaintiff); *Allen v. Leonard*, 28 Iowa 529, 530–31 (1870) (holding wrongfully accused man had not sated causes of action for battery or false imprisonment but could have stated a cause of action for malicious prosecution); *State v. Ross*, 21 Iowa 467, 471 (1866) (rejecting claims by defendants that they could not be criminally prosecuted despite being arrested in Missouri in violation of that state's law); *Mayo v. Sample*, 18 Iowa 306, 310–11 (1865) (rejecting plaintiff's cause of action against a police chief for slander, as accusations by police chief that plaintiff was a thief were privileged); *Hutchinson v. Sangster*, 4 Greene 340, 341–42 (Iowa 1854) (rejecting claims against a marshal for false imprisonment and trespass by plaintiff who was arrested for drunkenly interrupting church service).

The Supreme Court, quoting Lord Camden's discussion in *Entick v. Carrington*, later explained that this private law regime was foundational:

> The great end for which men entered into society was to secure their property. That right is preserved sacred and incommunicable in all instances where it has not been taken away or abridged by some public law for the good of the whole. . . . [E]very invasion of private property, be it ever so minute, is a trespass. No man can set his foot upon my ground without my license, but he is liable to an action, though the damage be nothing, which is proved by every declaration in trespass where the defendant is called upon to answer for bruising the grass and even treading upon the soil. If he admits the fact, he is bound to show, by way of justification, that some positive law has justified or excused him. The justification is submitted to

the judges, who are to look into the books, and see if such a justification can be maintained by the text of the statute law, or by the principles of the common law. If no such excuse can be found or produced, the silence of the books is an authority against the defendant, and the plaintiff must have judgment. According to this reasoning, it is now incumbent upon the defendants to show the law by which this seizure is warranted. If that cannot be done, it is a trespass.

*Boyd v. United States,* 116 U.S. 616, 627 (1886) (quoting *Entick,* 19 How. St. Tr. 1029), *overruled by Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294 (1967).

3.

When the text of the Iowa Constitution is read in its authentic historical context, the original meaning of the constitutional prohibition against unreasonable seizures and searches becomes clear. *See generally Kansas v. Colorado,* 206 U.S. 46, 94–95 (1907) (stating the "common law throws light on the meaning and scope of the Constitution of the United States" and the Constitution "must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution" (quoting *Wong Kim Ark,* 169 U.S. at 654)). As explained in *State v. Wright,* the prohibition against unreasonable seizures and searches was nothing more than a great affirmance of the common law:

John Adams first introduced the term "unreasonable" into search and seizure law in his draft of the 1780 Massachusetts Constitution. *See Commonwealth v. Haynes,* 116 A.3d 640, 650 (Pa. Super. Ct. 2015). "Adams's authorship reveals that 'unreasonable' was derived from Sir Edward Coke's earlier use of 'against reason' as a synonym for inherent illegality or unconstitutionality." Thomas Y. Davies, *Recovering the Original Fourth Amendment,* 98 Mich. L. Rev. 547, 554–55 (1999).

The Fourth Amendment did not refer to reasonableness in a relativistic, balancing sense. "Originally, the word 'unreasonable' in

the Fourth Amendment likely meant 'against reason'—as in 'against the reason of the common law.' " *Carpenter v. United States*, [138 S. Ct. 2206, 2243] (2018) (Thomas, J., dissenting) (quoting Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1270 (2016)); *see also Torres v. Madrid*, [141 S. Ct. 989, 996] (2021) ("Early American courts . . . embraced other common law principles of search and seizure."); *United States v. Carloss*, 818 F.3d 988, 1006 (10th Cir. 2016) (Gorsuch, J., dissenting) ("[T]he Fourth Amendment, at a minimum, protects the people against searches of their persons, houses, papers, and effects to the same degree the common law protected the people against such things at the time of the founding, for in prohibiting 'unreasonable' searches the Amendment incorporated existing common law restrictions on the state's investigative authority."). Justice Story, in his leading treatise on the Federal Constitution, stated the prohibition against unreasonable seizures and searches "is little more than the affirmance of a great constitutional doctrine of the common law." 3 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1894–1895, at 748 (1833). "[B]y prohibiting 'unreasonable' searches and seizures in the Fourth Amendment, the Founders ensured that the newly created Congress could not use legislation to abolish the established common-law rules of search and seizure." *Carpenter*, [138 S. Ct. at 2243].

961 N.W.2d at 404–05 (omission and third and fourth alterations in original).

This authentic historical reading of the Iowa Constitution is supported by the persuasive authorities. By the time of Iowa's founding, other states had already concluded that their constitutional seizure and search provisions were an affirmance of the common law regulatory regime, including the right to bring nonconstitutional causes of action against government officials for seizures and searches conducted in violation of the law. *See, e.g., Larthet*, 2 La. Ann. at 525–26 (explaining the Fourth Amendment was "an affirmance of a great constitutional doctrine of the common law"); *Mayo*, 1 N.H. at 56 (stating the constitution adopts the common law and the text should be understood as it was at common law); *Wakely v. Hart*, 6 Binn. 316, 319 (Pa. 1814) ("These are

principles of the common law, essential to the welfare of society, and not intended to be altered or impaired by the constitution. The whole section indeed was nothing more than an affirmance of the common law, for general warrants have been decided to be illegal."); *Wells*, 17 Va. (3 Munf.) at 481 (concluding a warrant was "illegal and void, upon the principles of the common law"). This interpretation of the constitutional prohibition against unreasonable seizures and searches was widely accepted hornbook law at the time of Iowa's founding. *See, e.g.*, Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 302–03 (1st ed. 1868) [hereinafter Cooley] (discussing the history of seizures and searches and concluding "it has not been deemed unwise to repeat in the State constitutions, as well as in the national, the principles already settled in the common law upon this vital point in civil liberty" (footnote omitted)).

The constitutional prohibition against unreasonable seizures and searches, as originally understood, was an injunction against lawmakers. It prohibited lawmakers from abrogating the preexisting common law regime of rights and remedies. *See Carpenter*, 138 S. Ct. at 2243 ("[B]y prohibiting 'unreasonable' searches and seizures in the Fourth Amendment, the Founders ensured that the newly created Congress could not use legislation to abolish the established common-law rules of search and seizure."); *Adams v. New York*, 192 U.S. 585, 598 (1904) ("The security intended to be guaranteed by the 4th Amendment against wrongful search and seizures is designed to prevent violations of private security in person and property and unlawful invasion of the

sanctity of the home of the citizen by officers of the law, acting under legislative or judicial sanction, and to give remedy against such usurpations when attempted."); *State v. Griswold*, 34 A. 1046, 1047 (Conn. 1896) (explaining the Connecticut Constitution "forbids the legislature to enact any statute, and the courts from passing any rule, which would authorize any unreasonable search or seizure of the goods of a citizen . . . . The theory of the defendant is that that act was a trespass. For the present purposes, that theory may be granted to be the true one. And what then? The police officers would be liable, in a proper action, to pay to the defendant all damage they had done him"); *State v. Fuller*, 85 P. 369, 372–74 (Mont. 1906) ("The provision in the state and federal Constitutions is therefore a limitation upon the powers of the respective governments declaring all searches and seizures unlawful and forbidding the Legislature and the Congress to authorize them . . . and the redress for the wrong therein denounced is an appropriate action directly against those who have been guilty of trespass.").

One of the specific ways in which the constitutional prohibition against unreasonable seizures and searches limited the power of lawmakers was its prohibition on legislation authorizing the use of general warrants (or enacting laws that would have the same effect). *See* Thomas Y. Davies, *An Account of* Mapp v. Ohio *That Misses the Larger Exclusionary Rule Story*, 4 Ohio St. J. Crim. L. 619, 623 (2007) ("The constitutional criminal procedure standards in the Bill of Rights were framed in 1789 to prevent legislative relaxation of basic common-law protections, such as the common-law ban against general warrants."). Recall

that valid warrants or other process were a defense to nonconstitutional causes of action against government officials. The constitution simply prohibited the legislature from authorizing a justification defense on anything less than a warrant issued "on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized." Iowa Const. art. 1, § 8.

Another way in which the constitutional prohibition against unreasonable seizures and searches limited lawmakers was that it protected traditional remedies. The constitutional protection for traditional remedies included "a right of action for damages" for conduct by a government official that was unlawful, tortious, or otherwise prohibited, on the same grounds as one would pursue any cause of action against a private citizen. *Girard v. Anderson*, 257 N.W. 400, 402–03 (Iowa 1934). This was the view of Chief Justice Marshall, who concluded that any law immunizing officials from liability was void:

> The federal sheriff, says he, will go into a poor man's house and beat him, or abuse his family, and the federal court will protect him. Does any gentleman believe this? Is it necessary that the officers will commit a trespass on the property or persons of those with whom they are to transact business? Will such great insults on the people of this country be allowable? Were a law made to authorize them, it would be void. The injured man would trust to a tribunal in his neighborhood. To such a tribunal he would apply for redress, and get it. There is no reason to fear that he would not meet that justice.

John Marshall, *Virginia Ratifying Convention* (June 20, 1788), *reprinted in* 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 554 (Jonathan Elliot ed., 1836). The leading treatise at the time of the enactment of the Iowa Constitution was in accord with Chief Justice

Marshall's understanding, providing that the constitution directed "the legislature to regard all those searches and seizures 'unreasonable' which have hitherto been unknown to the law, and on that account to abstain from authorizing them; *leaving parties and the public to the accustomed remedies*." Cooley at 307 (emphasis added).

4.

Relevant doctrine at the time of Iowa's founding dictates the conclusion that article I, section 8 of the Iowa Constitution, as originally understood, guaranteed a right to pursue civil causes of action against government officials. Under modern seizure and search doctrine, article I, section 8 is understood to establish a substantive standard of "reasonableness" that directly regulates the conduct of an executive branch official conducting a seizure or search. Further, under modern seizure and search doctrine, judges, rather than juries, are to determine whether the executive branch official engaged in unreasonable conduct. But our modern seizure and search doctrine would not have made any sense to the framers of the Iowa Constitution.

At the time of Iowa's founding, article I, section 8 could not have been understood to establish a substantive standard of "reasonableness" that regulated the conduct of executive branch officials conducting seizures or searches because there was no conception that such officials were subject to constitutional restraint. Our modern doctrine—that officials conducting seizures or searches are state actors whose conduct could be considered constitutional

or unconstitutional—arose only after (long after) the enactment of the Iowa Constitution. As one scholar has explained:

> [T]he Framers . . . did not anticipate that a wrongful act by an officer might constitute a form of government illegality--rather, they viewed such misconduct as only a personal trespass by the person who held the office. Thus, there was neither a need nor a basis for addressing the conduct of a warrantless officer in a constitutional provision regulating government authority. (Likewise, because unlawful acts by officers were only personal, it never occurred to the Framers to apply an exclusionary principle to such misconduct.) The modern notion that an officer's misconduct constitutes government illegality appears to reflect a redefinition of the boundary of government action articulated during the late nineteenth-century formulation of "state action" doctrine under the Fourteenth Amendment. However, that constituted a low-visibility revolution in constitutional thought; the Framers had no such concept.

Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. at 554.[10]

At the time of Iowa's founding, a plaintiff thus could not seek damages against a government entity employing an offending official because an official engaged in conduct that was unlawful, tortious, or otherwise prohibited was not considered an agent of the government. *See Easterly v. Incorporated Town of Irwin*, 68 N.W. 919, 920 (Iowa 1896) ("But the question remains, is the defendant responsible for the acts of its officers in such cases? The rule of law seems to be well settled that a city or town is not liable for the acts of its officers in attempting

---

[10] *See also* Thomas Y. Davies, *Can You Handle the Truth? The Framers Preserved Common-Law Criminal Arrest and Search Rules in "Due Process of Law"-"Fourth Amendment Reasonableness" Is Only A Modern, Destructive, Judicial Myth*, 43 Tex. Tech L. Rev. 51 (2010); Thomas Y. Davies, *The Supreme Court Giveth and the Supreme Court Taketh Away: The Century of Fourth Amendment "Search and Seizure" Doctrine*, 100 J. Crim. L. & Criminology 933 (2010); Thomas Y. Davies, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law"*, 77 Miss. L.J. 1 (2007); Thomas Y. Davies, *An Account of* Mapp v. Ohio *That Misses the Larger Exclusionary Rule Story*, 4 Ohio St. J. Crim. L. 619 (2007); Thomas Y. Davies, *The Fictional Character of Law-and-Order Originalism: A Case Study of the Distortions and Evasions of Framing-Era Arrest Doctrine* in *Atwater v. Lago Vista*, 37 Wake Forest L. Rev. 239 (2002).

to enforce its police regulations, for the reason that in such matters the officers can in no sense be regarded as the agents or servants of the city."); *Calwell v. City of Boone,* 2 N.W. 614, 615 (Iowa 1879) ("The police regulations of a city are not made and enforced in the interest of a city in its corporate capacity, but in the interest of the public. A city is not liable, therefore, for the acts of its officers in attempting to enforce such regulations.").

The modern conception that article I, section 8 created a substantive standard of "reasonableness" governing seizures and searches is a prochronistic error that imposes, post hoc, principles of state action, agency law, and vicarious liability that run directly counter to the law at the time of Iowa's founding. In the absence of any concept of state action, article I, section 8 would have legal effect only if it prohibited lawmakers from undermining the common law regime of rights and remedies.

In a decision postdating Iowa's founding, the Supreme Court of Georgia articulated the original meaning and operational effect of the constitutional prohibition against unreasonable seizures and searches:

> Irrespective of the many respectable authorities above referred to, and speaking for ourselves, we are satisfied that the contention of the accused, that her constitutional rights were infringed by the ruling of the trial judge admitting the evidence complained of, ought not to be sustained. As we understand it, the main, if not the sole, purpose of our constitutional inhibitions against unreasonable searches and seizures, was to place a salutary restriction upon the powers of government. That is to say, we believe the framers of the constitutions of the United States and of this and other states merely sought to provide against any attempt, by legislation or otherwise, to authorize, justify, or declare lawful, any unreasonable search or seizure. **This wise restriction was intended to operate upon legislative bodies, so as to render ineffectual any effort to legalize by statute what the people expressly stipulated could**

**in no event be made lawful; upon executives, so that no law violative of this constitutional inhibition should ever be enforced; and upon the judiciary, so as to render it the duty of the courts to denounce as unlawful every unreasonable search and seizure, whether confessedly without any color of authority, or sought to be justified under the guise of legislative sanction. For the misconduct of private persons, acting upon their individual responsibility and of their own volition, surely none of the three divisions of government is responsible. If an official, or a mere petty agent of the state, exceeds or abuses the authority with which he is clothed, he is to be deemed as acting, not for the state, but for himself only; and therefore he alone, and not the state, should be held accountable for his acts. If the constitutional rights of a citizen are invaded by a mere individual, the most that any branch of government can do is to afford the citizen such redress as is possible, and bring the wrongdoer to account for his unlawful conduct. The office of the federal and state constitutions is simply to create and declare these rights.**

*Williams v. State*, 28 S.E. 624, 627–28 (Ga. 1897) (emphasis added), *abrogation recognized by Mobley v. State*, 834 S.E.2d 785, 794 (Ga. 2019).

C.

It seems clear to me that article I, section 8 of the Iowa Constitution, as originally understood, protected and guaranteed the right to assert nonconstitutional causes of action against government officials for conduct relating to seizures and searches. How far that protection and guarantee extends and whether the nature of the right must be reconsidered in light of subsequent doctrinal developments, such as the state action doctrine, are good questions that should be considered further. At first blush, however, it appears that article I, section 8, as originally understood, has implications for civil litigants who, like Lennette, claim to be aggrieved by allegedly unlawful seizures and searches. A strong argument can be made that such litigants need not assert

constitutional causes of action for alleged violations of article I, section 8 because article I, section 8 itself preserves a constitutional right to assert nonconstitutional causes of action against government officials. The State certainly has the right to assert its immunity as sovereign from any such claims, but it appears article I, section 8 precludes the State from extending its cloak of sovereign immunity to government officials who commit tortious conduct. *Cf.* Iowa Code § 669.14(4) (2022) (barring claims against the state for "assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, [and] slander"). In reaching that conclusion, I am not navigating in uncharted waters; this court reached the same conclusion years ago:

> No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man, who by accepting office participates in its functions, is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives. Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class.

*Hoover v. Iowa State Hwy. Comm'n*, 222 N.W. 438, 439–40 (Iowa 1928) (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882)).

## III.

The original meaning of article I, section 8 also has important implications for the administration of criminal law.

A.

The original meaning of article I, section 8 counsels in favor of reconsidering the exclusionary rule. As demonstrated above, at the time of Iowa's founding, a government official obtaining evidence or effecting an arrest in an unlawful, tortious, or otherwise prohibited manner did not violate the constitution. The government official's conduct was private misconduct giving rise to private redress. *See, e.g., Ward*, 36 N.W. at 767 (rejecting constitutional argument despite recognizing that the "officer in this case may have been guilty of a trespass"). As we explained in *State v. Tonn*, the rejection of the exclusionary rule does "not detract one iota from the full protection vouchsafed to the citizen by the constitutional provisions [because a] trespassing officer is liable for all wrong done in an illegal search or seizure." 191 N.W. 530, 534–36 (Iowa 1923), *abrogated by State v. Hagen*, 137 N.W.2d 895 (Iowa 1965).

The fundamental defect of the exclusionary rule, as it relates to seizures and searches, is not that it is a bad remedy, it is that it is no remedy at all given the nature of the constitutional right as originally understood and implemented. *See State v. Nelson*, 300 N.W. 685, 688 (Iowa 1941) (explaining the exclusionary rule "has a strange sound" for a remedy of when the constitutional prohibition is "viewed in the light of its origin and history" (quoting *People v. Defore*, 150 N.E. 585, 589 (N.Y. 1926))). This explains why this court rejected the exclusionary rule for so long. *See State ex rel. Hanrahan v. Miller*, 98 N.W.2d 859, 861 (Iowa 1959); *State v. Smith*, 73 N.W.2d 189, 190 (Iowa 1955); *State ex rel. Kuble v. Bisignano*, 28 N.W.2d 504, 507–08 (Iowa 1947); *State v. Bradley*, 3 N.W.2d 133,

134–35 (Iowa 1942); *State v. Gillam*, 300 N.W. 567, 568 (Iowa 1941); *State v. Rowley*, 248 N.W. 340, 342–43 (Iowa 1933); *State v. Bourgeois*, 229 N.W. 231, 232 (Iowa 1930); *State v. Rollinger*, 225 N.W. 841, 841 (Iowa 1929); *State v. Bamsey*, 223 N.W. 873, 874 (Iowa 1929); *State v. Lambertti*, 215 N.W. 752, 753 (Iowa 1927); *State v. Korth*, 215 N.W. 706, 707 (Iowa 1927); *State v. Wenks*, 202 N.W. 753, 753 (Iowa 1925); *McNamara v. Utterback*, 200 N.W. 699, 700 (Iowa 1924); *Lucia v. Utterback*, 198 N.W. 626, 628 (Iowa 1924); *State v. Rowley*, 195 N.W. 881, 881–82 (Iowa 1923); *Foley v. Utterback*, 195 N.W. 721, 722 (Iowa 1923) (per curiam); *Joyner v. Utterback*, 195 N.W. 594, 596 (Iowa 1923).

Indeed, the federal exclusionary rule arose out of a case challenging the legality of a statute and not the conduct of an individual officer. The federal exclusionary rule is generally thought to have originated in the Supreme Court's decision in *Boyd v. United States*, 116 U.S. 616. *Boyd* involved the forfeiture of property due to a violation of customs and revenue laws. *Id.* at 617. Under a federal statute governing customs and revenue laws, the claimants were required to produce documentation regarding their business activities. *Id.* at 618. The claimants did not challenge an official's conduct as unlawful. *See id.* Instead, they challenged the legality of the statute requiring the production of documents. *Id.* The court held that the "law which authorized the order" of production was "unconstitutional and void" and the documents produced pursuant to the statute could not be used in evidence. *Id.* at 638. *Boyd* is consistent with the original understanding of the Fourth Amendment, as articulated above, insofar as it recognizes that the Fourth Amendment applied to lawmakers and not

officers in the field. An officer's individual conduct was left to the common law and private redress.

Of course, modern doctrinal developments, particularly the state action doctrine, and factual developments, including the emergence of an investigative, professionalized police force, may now require additional remedies beyond private rights of action and may counsel in favor of continued adherence to the exclusionary rule. In making that determination, however, we should approach the question with an open mind in light of the constitution's text as informed by context, precedent, and history.

B.

To the extent this court and other courts continue to hold the constitutional prohibition against unreasonable seizures and searches sets a substantive standard of conduct regulating government officials, what is deemed reasonable should correlate to the common law regime the constitutional right was meant to protect from legislative abrogation.

Correcting course and reconnecting the concept of reasonableness to common law or positive law largely solves the frequently litigated issue of when a warrant is required. The common law or positive law approach recognizes that the constitutional prohibition against unreasonable seizures and searches does not, despite numerous pronouncements to the contrary, impose a warrant requirement in all circumstances with carefully drawn exceptions. "What it explicitly states regarding warrants is by way of limitation upon their issuance rather than requirement of their use." *California v. Acevedo,* 500 U.S. 565, 581

(1991) (Scalia, J., concurring). But the common law or positive law approach does tell us when a warrant is required: generally speaking, an officer engaged in general criminal investigation must obtain a warrant before engaging in means and methods of investigation that are unlawful, tortious, or otherwise prohibited because the warrant serves (and would have served in the founding era) as the officer's legal authorization, or justification, to engage in actionable or prohibited conduct. *Wright*, 961 N.W.2d at 416 ("Within the meaning of article I, section 8, an officer acts unreasonably when, without a warrant, the officer physically trespasses on protected property or uses means or methods of general criminal investigation that are unlawful, tortious, or otherwise prohibited."); *see also* William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821, 1825–26 (2016) [hereinafter Baude & Stern].

Consider an example that, in my view, demonstrates why the common law or positive law approach is more sensible than a general "reasonableness" standard: a police officer searches the Internet for information regarding a suspect and searches through the suspect's public Facebook posts to obtain information about the suspect. Under modern search doctrine, a court would say that the police officer's search was not a "search" within the meaning of the constitutional prohibition because the search did not violate the suspect's reasonable expectation of privacy. *See, e.g., United States v. Meregildo*, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012) ("Because Colon surrendered his expectation of privacy, the Government did not violate the Fourth Amendment when it

accessed Colon's Facebook profile through a cooperating witness."); *State v. Breuer*, 577 N.W.2d 41, 45 (Iowa 1998) ("[A] search is said to have occurred when the government unreasonably intrudes upon an individual's reasonable or legitimate expectation of privacy."). This approach is contrary to common sense and the plain language of the constitutional prohibition. *See Minnesota v. Carter*, 525 U.S. 83, 97, (1998) (Scalia, J., concurring) (explaining that when modern doctrine is applied "to determine whether a 'search or seizure' within the meaning of the Constitution has occurred (as opposed to whether that 'search or seizure' is an 'unreasonable' one), it has no plausible foundation in the text of the Fourth Amendment" (emphasis omitted)).

Consider the same example under the common law or positive law approach to the constitution. Under this traditional approach, the officer's search of the Internet was, in fact, a search, as that term is commonly understood. However, the officer did not need to obtain a warrant to conduct the search because the officer did not violate any law or engage in any conduct that would have required the legal justification of a warrant. *See Wright*, 961 N.W.2d at 417 (holding officer violated article I, section 8 when he conducted a warrantless search of the defendant's papers and effects contained in a trash bag in violation of a municipal ordinance); Baude & Stern, 129 Harv. L. Rev. at 1825–26.

## IV.

"This court is the final arbiter of the meaning of the Iowa Constitution. While we give respectful consideration to the decisions of the United States

Supreme Court in its interpretation of parallel provisions of the Federal Constitution, we have a duty to independently interpret the Iowa Constitution." *Wright*, 961 N.W.2d at 402. In my view, article I, section 8 was meant to protect and maintain a robust common law, or positive law, regime regulating the conduct of government officials. This court should seek to give effect to that meaning even where it may deviate from current federal jurisprudence. With that understanding, I join the court's opinion disposing of Lennette's constitutional and nonconstitutional claims.